IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


ANTHONY M.,[1]

        Plaintiff,

v.

COMMISSIONER, Social Security Administration,

        Defendant.

Case No. 3:19-cv-01118-YY

OPINION AND ORDER

YOU, Magistrate Judge:

Plaintiff Anthony M. seeks judicial review of the Commissioner's final decision denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(g)(3). For the reasons that follow, the Commissioner's decision is REVERSED and REMANDED for further proceedings.

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case.

## PROCEDURAL HISTORY

Plaintiff filed for SSI on November 2, 2016, and alleges disability beginning November 2, 2016. Tr. 16.[2] Plaintiff's application was initially denied on January 31, 2017, and upon reconsideration on May 24, 2017. Tr. 16. Plaintiff filed a written request for a hearing before an Administrative Law Judge ("ALJ"), which took place on July 13, 2018. Tr. 16; 33–56. After receiving testimony from plaintiff and a vocational expert, ALJ John Michaelsen issued a decision on September 17, 2018, finding plaintiff not disabled within the meaning of the Act. Tr. 16–27. The Appeals Council denied a request for review on May 21, 2019. Tr. 1–7. Therefore, the ALJ's decision is the Commissioner's final decision and subject to review by this court. 20 C.F.R. § 416.1481.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion and "'may not affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*, 759 F.3d 995, 1009–10 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). This court may not substitute its judgment for that of the Commissioner when the evidence can reasonably support either affirming or reversing the decision. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Instead, where the evidence is susceptible to more than one rational interpretation, the

---

[2] Plaintiff originally filed an additional application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and alleged disability beginning March 29, 2000. Tr. 16. Before his hearing, plaintiff amended his disability onset date to November 2, 2016. *Id.* In doing so, he became ineligible for DIB. *Id.*

Commissioner's decision must be upheld if it is "supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted); *see also Lingenfelter*, 504 F.3d at 1035.

## SEQUENTIAL ANALYSIS AND ALJ FINDINGS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. § 416.920; *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006) (discussing *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999)).

At step one, the ALJ found plaintiff has not engaged in substantial gainful activity since November 2, 2016, the alleged onset date. Tr. 19. At step two, the ALJ determined plaintiff suffers from the following severe impairments: "depression; anxiety/posttraumatic stress disorder (PTSD); history of alcoholism; mild degenerative joint disease of the right shoulder." *Id.* While the ALJ recognized other impairments in the record, including hypertension, urethral stricture, obesity, and low back pain, he concluded that these did "not constitute severe medically determinable impairments." *Id.*

At step three, the ALJ found plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Tr. 19–21. The ALJ then assessed plaintiff's residual functional capacity ("RFC") and determined he could perform medium work as defined in 20 C.F.R. § 404.1567(c) and 416.967(c) with the following limitations: he could frequently reach with his right upper extremity, and he could perform

"simple, repetitive, routine tasks with no more than cursory, incidental contact with coworkers, and [have] no contact with the general public." Tr. 21.

At step four, the ALJ found plaintiff had no past relevant work. Tr. 26. At step five, the ALJ found that considering plaintiff's age, education, work experience, and RFC, he could perform jobs that existed in significant numbers in the national economy. Tr. 26–27. The jobs included floor cleaner, hospital housekeeper, and officer cleaner. Tr. 27. Thus, the ALJ concluded plaintiff was not disabled. Tr. 27.

## DISCUSSION

Born in 1970, plaintiff was 46 on his alleged onset date. He was diagnosed with PTSD and depression as the result of various life events. Plaintiff, who is Native American, described growing up against with "severe racism." Tr. 525. He felt he was "hunted," had "guns pointed at [his] face" on numerous occasions, and "white kids tried to kill him a couple of times." Tr. 525-26, 534. When plaintiff was 15, he accidentally hit and killed a bicyclist with his car, after the bicyclist ran a red light. Tr. 525. In 1994, plaintiff suffered the death of his 13-month-old daughter, which resulted in "significant terror and a sense of helplessness." Tr. 526. Following the death of his daughter, plaintiff buried himself in work and drank alcohol until he "broke" in 2000. Tr. 526. After that, he could no longer hold a job and became homeless. *Id.*

Plaintiff argues the ALJ erred by improperly rejecting his subjective symptom testimony and the opinions of two medical sources. These arguments are addressed in turn below.

## I.     Subjective Symptom Testimony

The ALJ is responsible for evaluating symptom testimony. SSR 16-3p, 2017 WL 5180304, at *1 (Oct. 25, 2017). If a claimant presents objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms

alleged, and there is no affirmative evidence of malingering, the ALJ must provide clear and convincing reasons to reject a claimant's testimony. *See Carmickle v. Comm'r*, 533 F.3d 1155, 1160 (9th Cir. 2008) (absent affirmative evidence that the plaintiff is malingering, "where the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains, an adverse credibility finding must be based on clear and convincing reasons") (quotation marks and citation omitted); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (the ALJ engages in a two-step analysis for subjective symptom evaluation: First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged"; and second, "if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms.") (quotation marks and citations omitted).

An ALJ may rely on inconsistencies between a plaintiff's testimony and the medical record. *Molina*, 674 F.3d at 1112; *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) (finding inconsistency where plaintiff testified that without her medication, her migraines would require an emergency room visit, but records showed not such visits). But to do so, the ALJ must include an "analysis of how or why [the claimant's] symptom testimony was inconsistent with the objective medical evidence." *Hardison v. Berryhill*, 703 F. App'x. 513, 515 (9th Cir. 2017).

Here, the ALJ found plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms" and did not identify evidence of malingering. Tr. 21. However, the ALJ concluded plaintiff's "statements concerning the

5 - OPINION AND ORDER

intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." Tr. 22. In particular, the ALJ cited to plaintiff's activities of daily living and medical treatment.

### A. Activities of Daily Living

An ALJ may discount a claimant's symptom testimony if it is inconsistent with the claimant's activities of daily living or if the claimant's participation in everyday activities indicates capacities that are transferrable to a work setting. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007); *Molina*, 674 F.3d at 1112–13. A claimant need not, however, be utterly incapacitated to receive disability benefits, and sporadic completion of minimal activities is insufficient to support a negative finding. *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001); *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

Here, the ALJ found plaintiff's "statements about the intensity, persistence, and limiting effects of his symptoms are inconsistent with his daily activities." Tr. 22. Specifically, he found plaintiff

> was able to advocate for himself, working to acquire transportation and housing assistance along with medical insurance. Prior to obtaining supported housing, the claimant's daily activities included digging holes for shelter, making a fire to heat food, and locating facilities for bathing, which actually indicated that the claimant was quite resourceful, and was limited only by his state of homelessness and not by his mental impairments. (7F/4). Cascadia records showed that the claimant developed positive relationships with residents and peers from group therapy; he even suggested various group activities such as local walks and a tour of a bakery. (14F/31, 40). The claimant babysat his grandchildren two days per week, which "keeps him pretty busy." (14F/65, 69, 75).

*Id*. The ALJ concluded that "[o]verall, this evidence of the claimant's activities is inconsistent with the claimant's allegations that he was precluded from all work, and demonstrates that the claimant is capable of performing work-related activities consistent with the residual functional capacity." *Id*.

The ALJ failed to identify what specific testimony he found inconsistent with activities of daily living or explain how plaintiff's activities of daily living were transferrable to a work setting. *See Orn*, 495 F.3d at 639. For instance, the ALJ did not explain how plaintiff's "daily activities" of "digging holes for shelter, making a fire to heat food, and locating facilities for bathing" were inconsistent with plaintiff's testimony that anxiety and PTSD kept him from working.[3] Tr. 40. It is unclear how these minimal, life-sustaining activities might contradict symptoms related to anxiety and PTSD. *See* Tr. 531 (describing how plaintiff "spends his time during the day looking for food, shelter and trying to survive"). Similarly, developing positive relationships in the context of group therapy does not contradict plaintiff's testimony regarding his mental impairments or suggest that plaintiff could maintain a job. *See Blake L. v. Berryhill*, 3:17-cv-01647-YY, 2019 WL 289098, at *6 (D. Or. Jan. 4, 2019) ("[T]wo of the three examples that the ALJ relied upon [to discredit plaintiff's subjective symptom testimony] involved plaintiff affirmatively seeking treatment: ALJs may not on the one hand discredit claimants for failure to seek treatment and on the other discredit those who do, based on their ability to interact with a medical provider.").

Moreover, while plaintiff's babysitting could indicate the ability to do more than alleged or indicate a capacity transferrable to work, there is no information to suggest that is the case here. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."). The ALJ cited records showing that plaintiff babysat only two days a week. However, as of January 2017, he "didn't do it that

---

[3] Notably, the ALJ also did not tie these activities to plaintiff's testimony regarding his degenerative joint disease.

7 - OPINION AND ORDER

often anymore." Tr. 532 ("I just stay to myself and worry about myself[.]  [T]hat is all I can handle right now.").  The record contains no information about other key facts, including the number of children in plaintiff's care, the ages of those children, the length of time spent babysitting, or what activities the babysitting entailed.  There is no information to suggest how or why babysitting two days a week might contradict plaintiff's testimony or show transferrable work skills.

In sum, the ALJ failed to identify specific testimony that was inconsistent with plaintiff's activities of daily living or how plaintiff's capacities were transferable to a work setting.  *See Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("[T]he ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony."); *Fair*, 885 F.2d at 603 ("[I]f a claimant is able to spend a substantial portion of the day engaged in pursuits involving the performance of functions that are transferrable to a work setting, a *specific finding* as to this fact may be sufficient." (emphasis added)).  The ALJ therefore erred in relying on plaintiff's activities of daily living as a basis for discounting his testimony.

### B. Objective Medical Evidence

#### 1. Degenerative Joint Disease

The ALJ rejected plaintiff's testimony about his degenerative joint disease as follows:

> The record establishes the existence of degenerative joint disease, but does not contain findings that support the degree of limitation alleged by the claimant. While the evidence documented the claimant had right shoulder pain after falling in February 2018, x-rays revealed only mild degenerative changes of the AC joint. (16F/2). Thereafter, physical examination showed his shoulders had full range of motion and his upper extremities had normal strength. The imaging and clinical findings related to his right shoulder are consistent with the residual functional capacity and do not justify greater limitations.

> The residual functional capacity accounts for the claimant's right shoulder problems by limiting him to the medium exertion level with a reaching restriction.

Tr. 22.

"An ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination." *Brown-Hunter v. Colvin*, 806 F. 3d 487, 489 (9th Cir. 2015). Instead, "the ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan*, 246 F.3d at 1208; *see also Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (holding the reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discount the claimant's testimony."). The ALJ erred by failing to do that here.

### 2. Mental Impairments

#### a. Medical Record

Regarding plaintiff's mental impairments, the ALJ found:

> [T]he claimant has no history of decompensation. Rather, the claimant consistently presented with good hygiene and appearance, his intelligence was considered average to above average, and his performance on mental status examinations did not indicate significant impairment. Medical records demonstrated symptom improvement with psychiatric medication, counseling, and the procurement of housing. Based on the totality of the objective evidence, any limitations arising from the claimant's depression, anxiety/PTSD, and history of alcoholism are accounted for in a residual functional capacity statement limiting him to simple, repetitive, routine tasks with social interaction restrictions.

Tr. 22. The ALJ then went on to recount plaintiff's medical appointments in more detail. *Id.* at 22-23. The ALJ concluded that plaintiff's 2016 records "support[] the claimant's residual functional capacity." Tr. 23. Regarding the 2017 and 2018 records, the ALJ found "[e]ven though he reported some occasional issues with concentration (e.g., 9F/2; 14F/75), this is accounted for in the claimant's residual functional capacity statement." *Id.*

9 - OPINION AND ORDER

Again, the ALJ failed to identify what specific testimony was contradicted by the medical records or why those medical records were inconsistent with plaintiff's testimony. *See Orn*, 495 F.3d at 639. The ALJ also failed to explain how hygiene, appearance, and intelligence are relevant to the issue of whether plaintiff is unable to work due to anxiety and PTSD. *See Malkin v. Saul*, 818 F. App'x 738, 740–41 (9th Cir. 2020) (while an evaluation noted that plaintiff "'made good eye contact and good interpersonal contact, and [that] her memory and concentration were intact[,]' . . . this aspect of the 2015 evaluation is largely beside the point— [plaintiff] testified that anxiety and panic attacks, 'not any cognitive impairments[,] caused [her] difficulty'") (alterations in original).

### b.     Improvement

An ALJ may reject subjective symptom testimony when there is evidence that symptoms improve with treatment. *Orteza*, 50 F.3d at 750. However, "[t]hat a person who suffers from [impairments] makes some improvement does not mean that the person's impairments no longer seriously affect [his] ability to function in a workplace." *Holohan*, 246 F.3d at 1205.

Here, the ALJ found that "[m]edical records demonstrated symptom improvement with psychiatric medication, counseling, and the procurement of housing." Tr. 22. The ALJ noted, for example, that plaintiff reported Celexa was helping, he enjoyed attending group counseling, and, at one point, he "admitted that his 'symptoms were getting better since he will have housing soon.'" Tr. 23. The ALJ also noted normal mental status exams and decreased frequency of suicidal thoughts. *Id.*

Plaintiff argues that the ALJ misstates the record and that the majority of the evidence shows he "had significant, ongoing mental symptoms with only partial relief from medications." Pl. Br. 8. Specifically, plaintiff contends the records show he continued to experience "severe

anxiety during medical appointments, [had] multiple altercations with residents and staff at his supported housing, and consistently report[ed] being tired and anxious." Pl. Br. 8.

Indeed, while some evidence supports the ALJ's position, it is limited, and there is support for plaintiff's contention that he continued to deal with significant, ongoing mental symptoms with only partial relief from medication. *See, e.g.*, Tr. 534 (January 2017: plaintiff "experiencing symptoms of intrusive memories, flashbacks, strong emotional and physiological response to triggers . . . thoughts of death, poor concentration, excessive worry with difficulty controlling the worry, fatigue," etc.); Tr. 637 (March 2018: noting behavioral issues at housing facility and suggesting plaintiff was unable to independently maintain/obtain housing); Tr. 641 (December 2017: plaintiff still experiencing symptom of PTSD and generalized anxiety disorder); Tr. 697 (December 2017: plaintiff report[ed] that his "mental and physical health are not good," and that he was still experiencing depression, trauma symptoms, inability to concentrate, and suicidal ideation); Tr. 733 (May 2017: note from doctor's office stating that plaintiff unable to complete doctors visit "because got anxious and vomited").

In the context of mental health, "[c]ycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of years and to treat them as a basis for concluding a claimant is capable of working." *Garrison*, 759 F.3d at 1017.

> Reports of 'improvement' in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms . . . [and] with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in the workplace.

*Id.*

11 - OPINION AND ORDER

Moreover, as discussed below, the ALJ erred in analyzing the opinions of plaintiff's treating providers. On remand, the ALJ shall reassess plaintiff's subjective symptom testimony in conjunction with a proper examination of the entire record.

## II.     Medical Opinion Evidence

Plaintiff argues the ALJ improperly rejected the opinions of two medical sources: Dr. Heydenrych, an examining physician, and Debra Cullen, a treating therapist.

Medical sources are divided into two categories: "acceptable medical sources" and "other sources." 20 C.F.R. §§ 416.913. Acceptable medical sources include licensed physicians and psychologists. 20 C.F.R. §§ 416.913(a). Medical sources classified as "other sources" include nurse practitioners, therapists, licensed clinical social workers, and chiropractors. 20 C.F.R. §§ 416.913(d).

### A.     Dr. Heydenrych

Social security law recognizes three types of physicians: (1) treating, (2) examining, and (3) nonexamining. *Garrison*, 759 F.3d at 1012. Generally, more weight is given to the opinion of a treating physician than to the opinion of someone who does not actually treat the claimant. *Id.*; 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2). More weight is also given to an examining physician than to a nonexamining physician. *Garrison*, 759 F.3d at 1012.

If a treating physician's opinion is not contradicted by another doctor, the ALJ may reject it only for clear and convincing reasons supported by substantial evidence in the record. *Ghanim v. Colvin*, 763 F.3d 1154, 1160–611 (9th Cir. 2014). Even if a treating physician's opinion is contradicted by another doctor, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence. *Id.* at 1161; *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

Dr. Heydenrych evaluated plaintiff on November 29, 2016. Tr. 524. The ALJ gave Dr. Heydenrych's opinion "limited weight." Tr. 24. First, the ALJ found "Dr. Heydenrych's opinion is contradicted by Dr. Kaper and Dr. Ju who are familiar with Social Security rules and had the opportunity to review the longitudinal medical evidence record instead of just a one-time snapshot of his presentation." Tr. 24. However, Dr. Heydenrych reviewed almost a year of records and her opinion, therefore, is more than a "one-time snapshot of [plaintiff's] presentation." Tr. 524. Moreover, to the extent the ALJ relied on unidentified contradictions between the opinion of Dr. Heydenrych and the opinions of nonexamining state agency physicians Dr. Kaper and Dr. Ju, "[t]he opinion of a nonexamining medical advisor cannot by itself constitute substantial evidence that justifies the rejection of the opinion of an examining or treating physician." *Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999) (citations omitted).

The ALJ also found:

> Dr. Heydenrych's finding of only mild alcohol use disorder is unpersuasive because the claimant has a severe and longstanding addiction problem, as evidenced by the mandatory sobriety policy at his current residence and the regular urine analyses performed to enforce that policy. In fact, the claimant has received services at Cascadia throughout the adjudicative period, in what appears to be a dual program that involves rehabilitation from substance abuse.

Tr. 24. Dr. Heydenrych did not opine that plaintiff does not suffer from alcohol use disorder or that this disorder has always been mild. Rather, the doctor noted that plaintiff reported abusing alcohol for "the past 25 years." Tr. 527. However, the doctor also noted that, as of January 2017, plaintiff "had not had a drink in a year and a half" and was motivated to continue his sobriety. *Id.*

The ALJ further found:

13 - OPINION AND ORDER

> While the existence of depression and PTSD that Dr. Heydenrych alludes to in her report is certainly consistent with the Cascadia treatment record, there is little indication or evidence in Cascadia medical records that those impairments were causing debilitating limitations. While there was some occasional mention of problems with concentration at times, the claimant's residual functional capacity accounts for that through the provision to perform simple, repetitive, routine tasks. Given the inconsistency between the claimant's medical records and Dr. Heydenrych's findings, it appears the degree of limitation Dr. Heydenrych describes is based heavily upon the claimant's subjective complaints.

Tr. 24. As a general matter, an ALJ may rely on inconsistencies between the medical records and a doctor's findings. *See Tommasetti*, 533 F.3d at 1041; *Ghanim*, 763 F.3d at 1161 ("A conflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider."). However, to the extent the ALJ relied on inconsistencies between Dr. Heydenrych's opinion and the Cascadia treatment record, the ALJ did not provide any specific citations to the record for the court to review. Moreover, the Cascadia records contain evidence that plaintiff's anxiety and PTSD indeed caused debilitating limitations.[4]

---

[4] *See*, *e.g.*, Tr. 414 (sleeping 12 hours a day on antidepressants), Tr. 418 (feelings that "No one can be trusted. The world is completely dangerous. My whole nervous system is completely ruined."); Tr. 421 ("The only down side to not drinking is that I can't push past the depression and pain to do anything."); Tr. 440 (feelings of hopelessness); Tr. 442 (experienced suicidal ideation and sought gun from friend); Tr. 444 ("Nothing feels safe anymore, but I just don't care," and general feelings of hopelessness); Tr. 458 (depression "makes you not want to do anything" and "can actually make your body hurt," resulting in difficulty "functioning with life"); Tr. 460 (describing isolation when experiencing anxiety: "I turn into a hermit."); Tr. 472 (in time of crisis, he will "[j]ust get away from people"); Tr. 499 (identifying goal of simply "being able to cope with day to day life"); Tr. 517 (sleeps most of the day in hole in ground covered by tarp); Tr. 522 (feeling always on guard even in situations he recognizes as safe: "Makes you not want to do anything."); Tr. 536 (severe anxiety and hypervigilance that becomes paranoia; anxiety makes him throw up; suicidal thoughts); Tr. 553 ("I need help with my rage."); Tr. 572 (vomited from anxiety during medical appointment); Tr. 591 (Celexa was working initially, but he has been having problems with mental health); Tr. 627 (continuing to struggle with anxiety and hypervigilance due to trauma); Tr. 631 (referred to himself as evil, dark, and bad person); Tr. 672 (failure to engage in therapy and isolating behavior: "this is a tough month for me"); Tr. 674 (received cause for termination notice from housing for acting out against other resident: "when I get triggered like that, I have tunnel vision); Tr. 680 (using alcohol to mitigate stressors;

Additionally, while an ALJ may reject an opinion that is premised on a claimant's properly discredited symptom testimony, *Fair*, 885 F.2d at 605, here, the ALJ erred in discrediting plaintiff's subjective symptom testimony, as discussed above. And even if the ALJ had not erred in discrediting plaintiff's subjective symptom testimony, "the rule allowing an ALJ to reject opinions based on self-reports does not apply in the same manner to opinions regarding mental illness." *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017). "Psychiatric evaluations may appear subjective, especially compared to evaluation in other medical fields. Diagnosis will always depend in part on the patient's self-report, as well as the clinician's observations of the patient. But such is the nature of psychiatry." *Id.* Clinical interviews and mental status evaluations are therefore considered "objective measures [that] cannot be discounted as a 'self-report.'" *Id.* Here, Dr. Heydenrych conducted a clinical interview and tests including the "Millon Clinical Multiaxial Inventory-3rd Edition (MCMI-III), a psychological measure that examines emotional and personality functioning and the presence of psychopathology, the PTSD Checklist for DSM-5 (PCL-5), and the ZUNG Self-Rating Depression Scale." Tr. 525. Dr. Heydenrych's psychological evaluation did not therefore rely solely on self-reports.

Finally, the ALJ found:

> Dr. Heydenrych fails to adequately address the effect that the combination of substance abuse, homelessness, and lack of finances has on the claimant's functioning level. The activities of daily living discussed in Dr. Heydenrych's report, such as digging holes for shelter, making a fire to heat food, and locating facilities for bathing, actually indicate that the claimant is quite resourceful, and again, appears to be limited only by his state of homelessness and not by his mental impairments.

---

"medications aren't working"; "so anxious that I am throwing up"; behavior was placing housing in jeopardy); Tr. 697 ("my mental and physical health are not good"); Tr. 733 (new psych medications were making him more tired/nauseous); Tr. 884-85 (suicidal behavior with medium risk).

15 - OPINION AND ORDER

Tr. 24. However, Dr. Heydenrych explained that plaintiff dug holes in wooded areas so that he could sleep in them and not be seen. Tr. 527. Dr. Heydenrych also described how plaintiff "struggles with his basic functioning, as he eats maybe once a day, heating up simple foods over a fire he makes." *Id.* He tried to shower weekly "if he can." *Id.* These actions do not show resourcefulness; rather, they were used by Dr. Heydenrych to illustrate how plaintiff "avoids people as much as possible, because of his anxiety and depression." *Id.* Moreover, Dr. Heydenrych adequately addressed plaintiff's substance abuse and lack of finances: plaintiff began abusing alcohol after his daughter passed away, and he had a strong work ethic and no significant problems in his prior jobs until his mental health and alcohol use interfered with his ability to work. Tr. 527. Accordingly, the record reflects it was plaintiff's PTSD and depression that resulted in his substance abuse, homelessness, and lack of finances, rather than the other way around, as the ALJ attempted to characterize it.

In sum, the ALJ failed to provide specific and legitimate reasons, supported by substantial evidence in the record, for rejecting Dr. Heydenrych's opinion.

### B.     Debra Cullen, QMHP

Cullen, as a qualified mental health professional, is an "other" or "non-acceptable" medical source. "Opinions from these medical sources, who are not technically deemed acceptable medical sources under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p, at *3.[5] Information from these sources may provide insight into "the severity

---

[5] While SSR 06-03p was rescinded in March of 2017, it still applies to claims filed before that date. *Kimberly S. v. Comm'r Soc. Sec.*, 3:18-cv-00173-AA, 2019 WL 2492277, *4 n.2 (D. Or. June 14, 2019). Because plaintiff's claim was filed November 2, 2016, SSR-03p therefore applies here.

16 - OPINION AND ORDER

of the impairment(s) and how it affects the individual's ability to function." *Id.* at *2. The ALJ must consider several factors when evaluating the opinion of such sources, including: (1) length of relationship and frequency of contact; (2) consistency of opinion with other evidence; (3) quality of source's explanation for opinion; (4) any specialty or expertise related to impairment; and (5) any other factors tending to support or refute the opinion. *See id.* at *2–3; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Evidence from "other" sources is considered under the same standard as that used to evaluate lay witness testimony, meaning the ALJ may reject it for reasons germane to the witness. *Molina*, 674 F.3d at 1111 (because physician's assistant was not an acceptable medical source, ALJ could discount physician's assistant's opinion for germane reasons).

On July 2, 2018, Cullen completed a mental residual functional capacity assessment, opining marked and moderate limits in a number of categories. Tr. 887-89. Cullen concluded plaintiff was likely to miss more than two days of work per month due to his impairments, symptoms, or medications and their side effects. Tr. 889. The ALJ gave this opinion "no weight." Tr. 25. The ALJ reasoned that (1) Cullen's finding were "unpersuasive in light of the claimant's daily activities," (2) Cullen was not an acceptable medical source, and (3) "the degree of debilitation Ms. Cullen described is inconsistent with the longitudinal medical evidence record, including Cascadia treatment notes, that shows unremarkable mental status exams, and that indicate the claimant's symptoms improved with medication, counseling, and stable housing." Tr. 25.

As discussed above, the ALJ erred in relying on plaintiff's activities of daily living. The ALJ also erred in rejecting Ms. Cullen's opinion simply because "she is not an acceptable medical source." Tr. 25. Non-acceptable medical source testimony is important testimony and

may not be rejected without comment. *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006). While non-acceptable medical opinions may be entitled to less weight or deference, "[a]n ALJ may not reject an opinion solely on the basis that it is proffered by a non-acceptable medical source." *See James B. v. Berryhill*, 6:17-cv-1888-SI, 2018 WL 5786218 (D. Or. Nov. 5, 2018).

Finally, an ALJ may discount lay testimony if it conflicts with the medical evidence. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001); *see also Bayliss*, 427 F.3d at 1218 (inconsistency with medical evidence constitutes germane reason). However, as discussed above, the ALJ relied on limited portions of the medical record to conclude that plaintiff had "unremarkable mental status exams" and his condition had improved. The ALJ also did not identify which parts of Cullen's opinion were inconsistent with which parts of the record. The ALJ therefore erred in the treatment of Cullen's opinion.

### III. Remand for Benefits

When a court determines the Commissioner erred in some respect in making a decision to deny benefits, the court may affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for a rehearing." *Treichler v. Comm'r Soc. Sec.*, 775 F. 3d 1090, 1099 (9th Cir. 2014) (quoting 42 U.S.C. § 405(g)). In determining whether to remand for further proceedings or immediate payment of benefits, the Ninth Circuit employs the "credit-as-true" standard when the following requisites are met: (1) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, (2) the record has been fully developed and further proceedings would serve no useful purpose, and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the plaintiff disabled on remand. *Garrison*, 759 F.3d at 1020 (9th Cir. 2014) (citations omitted). Even if all of the requisites are met,

however, the court may still remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled[.]" *Id.* at 1021.

For the reasons described herein, the ALJ erred in evaluating plaintiff's subjective symptom testimony and the medical opinions of an examining physician and a "non-acceptable" treating therapist. Accordingly, the first prong of the credit-as-true analysis is met.

However, outstanding conflicts between the opinions of state agency physicians and Dr. Heydenrych and Cullen remain to be resolved in light of this decision. Accordingly, the court does not apply the third prong of the credit-as-true analysis. Because it is beyond the court's ambit to weigh or re-weigh the record evidence and thereby substitute its judgment for that of the ALJ, the proper remedy is to remand for additional proceedings. *See Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

## CONCLUSION

For the reasons discussed above, the decision of the Commissioner is REVERSED and REMANDED for further proceedings consistent with this opinion.

IT IS SO ORDERED.

Dated: November 24, 2020.

                                                        /s/ Youlee Yim You
                                                        Youlee Yim You
                                                        United States Magistrate Judge